United States District Court
Southern District of Texas
**ENTERED**
September 24, 2025
Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| JAMES LOGAN DIEZ, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 2:24-CV-00295 |
| | § | |
| MR. SCHNEIDER, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND RECOMMENDATION TO GRANT DEFENDANTS' MOTION TO DISMISS AND TO DISMISS ALL OF PLAINTIFF'S CLAIMS

Plaintiff James Logan Diez, appearing *pro se*, has filed this prisoner civil rights action pursuant to 42 U.S.C. § 1983. Plaintiff has paid the $405.00 filing fee. Pending before the Court is a Motion to Dismiss filed by Allen Schneider and Bobby Lumpkin. (D.E. 28).

For the reasons set forth below, the undersigned respectfully recommends that this motion be **GRANTED**. Additionally, the undersigned recommends that all of Plaintiff's claims against all members of the Director's Review Committee be **DISMISSED**. If this Memorandum and Recommendation is adopted, there will be no remaining claims before the Court. Therefore, the undersigned further recommends the Court enter final judgment.

## I.    JURISDICTION

The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.  This case has been referred to the undersigned magistrate judge for case management and making recommendations on dispositive motions pursuant to 28 U.S.C. § 636.

## II.    BACKGROUND

Plaintiff is housed at the McConnell Unit in Beeville, Texas and was housed at the McConnell Unit during the period relevant to this action.  Plaintiff, a sixty-eight-year-old male at the time he filed this complaint, alleged he was a properly registered voter who was eligible to vote in the November 2024 election.  (D.E. 1, p. 7).  A *Spears*[1] hearing was held on January 8, 2025, where Plaintiff was given an opportunity to explain his claims.

Plaintiff raises claims under the First Amendment and the Voting Rights Act ("VRA"), 52 U.S.C. § 10101, *et seq.* in connection with his inability to vote while a McConnell unit inmate.  (*See* D.E. 2).  In his original complaint, Plaintiff seeks actual and punitive damages.  (D.E. 1, p. 6).  Plaintiff clarified during the *Spears* hearing that he also seeks an injunction allowing him to vote in the future for as long as he is eligible through changes in the TDCJ voting policies.  (D.E. 14, pp. 21-23).

### A.    Plaintiff's First Action and Additional Background Information

This is not Plaintiff's first inmate voting rights case.  In *Diez v. Doe*, No. 2:24-cv-0063 (S.D. Tex. filed March 4, 2024) ("*Diez I*"), Plaintiff brought a civil rights action against the McConnell Unit law librarian supervisor and several other TDCJ officials

---

[1] *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985); *see also Eason v. Holt*, 73 F.3d 600, 603 (5th Cir. 1996) (stating that testimony given at a *Spears* hearing is incorporated into the pleadings).

alleging the defendants violated his right to vote.  (*Diez I*, D.E. 1).  Regarding *Diez I*, the undersigned entered a Memorandum and Recommendation ("*Diez I* M&R") to dismiss Plaintiff's claims primarily because Plaintiff failed to follow the appropriate procedures to request an absentee ballot and vote by mail. Plaintiff filed objections to the M&R.  *Id.*, D.E. 10.

After the entry of the *Diez I* M&R, Plaintiff complained of interference with his right to vote by additional defendants.  *Id.*, D.E. 18, D.E. 19.  Some of Plaintiff's relevant conviction history and alleged history of having difficulty voting while a TDCJ inmate are taken as follows from the *Diez I* M&R.

In December 2018, Plaintiff was charged with felony offenses in *State v. James Diez*, No. 48895, 424th District Court, Burnet Co., Texas.  Plaintiff was convicted after a jury trial, and he was sentenced to 30 years custody on May 17, 2022. Plaintiff filed a notice of appeal on May 25, 2022 .  Plaintiff's criminal case is currently on appeal.  *See James Logan Diez v. State of Texas*, No.03-22-00337-CR, Court of Appeals, 3rd District of Texas.  The case was submitted to the state appellate court on the parties' briefing on March 27, 2024. As of the date of this Memorandum and Recommendation, the Court of Appeals for the 3rd District of Texas has not issued or rendered a decision.

Plaintiff was released on bond during the trial of his criminal case, although he was remanded into custody after he was convicted.  After his conviction, Plaintiff was initially detained temporarily in the Burnet County Jail.  In July 2022, Plaintiff was transferred to the TDCJ Byrd Unit in Huntsville, Texas, for inmate intake procedures. Plaintiff was then transferred to the McConnell Unit in Beeville, Texas in August 2022 where he remains.

Prior to being incarcerated, Plaintiff was registered to vote in Burnet County, Texas.  Plaintiff testified at the *Spears* hearing that he has been registered to vote since May 2016 and he believes he is still registered to vote.  Voting is important to Plaintiff.  Upon arrival at the McConnell Unit,

Plaintiff began asking officers and writing I-60 request forms for information about how to vote. While several officers and TDCJ officials told Plaintiff they would look into it and get back with him, without exception, no one ever followed up with Plaintiff regarding information about how to vote. Plaintiff never received a written response to any of these I-60 request forms. At some point, Plaintiff was told to ask the law librarian for assistance. However, Plaintiff's Memorandum of Law cites the TDCJ-CID Offender Orientation Handbook which according to Plaintiff states in relevant part, "Information regarding how to contact the Registrar of voters in your county or the Elections Division of the Secretary of State's Office is available in the unit law library." (D.E. 2, p. 1).

Plaintiff spoke to each named Defendant in person and asked: "How do I vote from this (McConnell) Unit? I'm already registered – I just need to know how to vote?" (D.E. 1, p. 5). The law librarian Supervisor told Plaintiff, "I don't have a clue!" When asked: "Will you find out for me?" she answered, "Not my job," and ordered Plaintiff to housing. (D.E. 1, p. 5). The law librarian supervisor is further alleged to have told Plaintiff, "I didn't know prisoners can vote!" and "I don't know why they sent you to me." Additionally, Plaintiff alleges the law librarian supervisor did not respond to his five to six I-60 forms in which he requested information about how to vote. Plaintiff also alleges he spoke with Warden Sanchez and Director Holmes[2] in person about his difficulty getting information about how to vote. Plaintiff alleges these defendants told him they would look into the matter but neither followed up with Plaintiff.

*Id.*, D.E. 10. On July 15, 2025, District Judge David S. Morales adopted the *Diez I* M&R and entered Final Judgment against Plaintiff. *Id.*, D.E. 26 and 27.

Plaintiff testified at the *Spears* hearing in this action that the Court of Appeals for the Third District of Texas denied his appeal. (D.E. 14, pp. 25-26). On June 29, 2024, the Third District Court of Appeals affirmed Plaintiff's Burnet County convictions and sentences. *Diez v. State*, 693 S.W.3d 899 (Tex.App.—Austin 2024, pet. ref'd). The Texas

---

[2] Plaintiff testified this encounter occurred when Director Holmes was visiting the McConnell Unit.

Court of Criminal Appeals then refused Plaintiff's Petition for Discretionary Review ("PDR") on March 12, 2025. *Id.*

### B.    Plaintiff's Allegations and Claims in this Action

In this action, Plaintiff sues: (1) TDCJ McConnell Unit assistant mailroom supervisor [FNU] Schneider ((Mailroom Supervisor Schneider"); (2) all members of the Director's Review Committee ("Unknown DRC members"); and (3) all members of the Texas Board of Criminal Justice ("Board members"). (D.E. 1, p. 4). Plaintiff's allegations indicate that his difficulties voting have persisted. Plaintiff alleges that after he filed *Diez I*, he followed all the necessary procedures to request an absentee ballot for the November 2024 elections from the elections administrator where he is registered to vote. (D.E. 14, pp. 4-5). The election administrator mailed Plaintiff appropriate forms to request an official absentee ballot. (D.E. 1, p. 6). Well in advance of the November 2024 election and within the period for Plaintiff to cast his ballot, Plaintiff's election official mailed Plaintiff an absentee ballot to cast by mail. (D.E. 14, pp. 5-7).

Mailroom Supervisor Schneider received the ballot and refused to provide the form to Plaintiff. (D.E. 1, p. 6; D.E. 14, p. 7). Mailroom Supervisor Schneider is alleged to have said, "You're a prisoner, it's already been decided you're not going to vote." (D.E. 1, p. 6). Plaintiff further alleges that he told Mailroom Supervisor Schneider he would get his voter ID card, which expires on December 31, 2025, and that was going to vote in the 2024 election. (D.E. 14, p. 8). Mailroom Supervisor Schneider responded: "No, you're not. You're not getting the form." *Id.*

Plaintiff filed a grievance on an I-60 form, which he sent to the McConnell Unit's head warden at that time.  *Id.* at 9.  Plaintiff complained in the I-60 form that he was eligible to vote "under 82004 of the Texas Election Code."  *Id.*  According to Plaintiff, his I-60 complaint was never answered.  (D.E. 1, p. 7).

Plaintiff also requested the election administrator to send him a replacement ballot due to the confiscation of his previous ballot.  (D.E. 1, p. 7; D.E. 14, p. 9).  When the replacement ballot arrived at the TDCJ McConnell Unit mailroom addressed to Plaintiff, Plaintiff alleges that Mailroom Supervisor Schneider again confiscated the ballot and told Plaintiff he was a prisoner and was not going to vote.  *Id.*

Pursuant to TDCJ procedures, Plaintiff appealed the denial of his mail to the TDCJ's DRC.  (D.E. 1, p. 7).  The DRC "is the body of appointed TDCJ administrators with the authority to hear all appeals related to rejected correspondence . . . . "  *See* TDCJ Board Policy-03.91 ("BP-03.91"), rev. 7, Dec. 15, 2023.[3]  The DRC denied the appeal, citing BP-03.91 that "disposition of electronic communication is not permitted."  (D.E. 1, p. 10).  Plaintiff testified at the *Spears* hearing that he did not understand the DRC's reasoning for the denial of the appeal of the confiscation of his ballot.  (D.E. 14, p. 13).  Plaintiff sues each of the Unknown DRC members because, in denying Plaintiff's appeal, they interfered with his right to vote.  (D.E. 1, p. 7; D.E. 14, p. 15).

---

[3] BP-03.91 is referenced in Plaintiff's complaint.  (*See* D.E. 1, p. 4).  This policy is available on TDCJ's website: https://tdcj.texas.gov/documents/policy/BP0391.pdf (last visited on September 17, 2025).

Plaintiff did not name TDCJ Director Bobby Lumpkin ("Director Lumpkin") as a defendant in his written complaint. However, during the *Spears* hearing, Plaintiff testified that the TDCJ leadership has conspired against him to interfere and prevent him from voting. (*See* D.E. 14, pp. 20-23). Plaintiff's *Spears* hearing testimony (D.E. 14), his complaint (D.E. 1), and brief (D.E. 2) indicate he sought to amend his complaint to add Director Lumpkin as a Defendant.

Plaintiff alleges TDCJ has a policy, albeit not written, to prevent inmates from voting. (D.E. 14, pp. 17, 20-21). Plaintiff alleges his right to vote has been consistently interfered with by personnel at the McConnell Unit. *Id.* Plaintiff alleges that while the TDCJ Offender Orientation Handbook recognizes an inmate's right to vote, in practice TDCJ employees and officials consistently do not recognize that certain inmates may have the right to vote. Further, Plaintiff asserts he served a period of confinement in TDCJ several decades ago. *Id.* at 19-20. During his prior period of confinement, Plaintiffs says, TDCJ had an inmate voters' assistance program which provided eligible inmates information and assistance voting. *Id.* at 22-23. During his prior period of incarceration in the TDCJ and with the assistance of the TDCJ voters assistance program, Plaintiff states he lawfully voted in several official elections. *Id.* at 22. Plaintiff alleges the TDCJ voters assistance program is no longer present or available to TDCJ inmates. *Id.* at 23. Additionally, Plaintiff testified that at least six other inmates in his housing area at the McConnell Unit are eligible to vote and have been unable to vote due to interference and actions by TDCJ officials. *Id.* at 20. By implication, Plaintiff alleges the removal of the

inmate voters assistance program is indicative of a change in policy of interference with inmates' voting rights.  *Id.*

### C.    Screening and Service of Plaintiff's Retained Claims

On January 16, 2025, the undersigned entered an Order and Memorandum and Recommendation ("January 16 Order and M&R"), which first ordered Director Lumpkin to be added as a defendant in this action.  (D.E. 10, p. 7).  The undersigned then recommended that the Court:

- retain Plaintiff's claims against Mailroom Supervisor Schneider concerning Plaintiff's right to receive mail and his right to vote brought under the First Amendment and the VRA;

- retain Plaintiff's claims against Director Lumpkin concerning his right to receive mail and his right to vote under the First Amendment and the VRA;

- retain Plaintiff's claims against the Unknown DRC members concerning his right to receive mail and his right to vote under the First Amendment and the VRA; and

- dismiss Plaintiff's remaining claims for failure to state a claim pursuant to 28 U.S.C. § 1915A(b)(1).

*Id.* at 11-20.  District Judge Nelva Gonzales Ramos adopted the undersigned's recommendations set forth in the January 16 Order and M&R.  (D.E. 41).

The undersigned initially ordered service of Plaintiff's claims on Mailroom Supervisor Schneider, Director Lumpkin, and the Unknown DRC members.  (D.E. 11). On March 3, 2025, the undersigned ordered service on the named parties, Mailroom Supervisor Schneider and Director Lumpkin.  (D.E. 21).  Plaintiff subsequently inquired as to whether the Unknown DRC members have been dismissed from this action.  (D.E.

27). The Unknown DRC members have not been served, but at the time of this writing, they remain defendants in this action.

### D.    Pending Motion to Dismiss

On April 8, 2025, Mailroom Supervisor Schneider and Director Lumpkin (referred to collectively as "Defendants") filed a Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  (D.E. 28).  Plaintiff filed his response to the motion. (D.E. 31).  On May 12, 2025, Defendants filed their reply.  (D.E. 35).  Plaintiff has filed additional advisories (D.E. 34, 37), memoranda (D.E. 38, 39), and a rebuttal to Defendants' reply (D.E. 40).   Defendants also submitted an advisory.  (D.E. 36).

## III.   LEGAL STANDARD

Section 1983 provides a vehicle for redressing the violation of federal law by those acting under color of state law.  *Nelson v. Campbell*, 541 U.S. 637, 643 (2004).  To prevail on a § 1983 claim, the plaintiff must prove that a person acting under the color of state law deprived him of a right secured by the Constitution or laws of the United States.  42 U.S.C. § 1983; *West v. Atkins,* 487 U.S. 42, 48 (1988).

Rule 12(b)(1) of the Federal Rules of Civil Procedure permits a defendant to move to dismiss for "lack of subject matter jurisdiction."  A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case.  *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) (citing *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1887 (2d Cir. 1996)).

When considering a motion to dismiss under Rule 12(b)(1), a court must "accept the complaint's well-pleaded factual allegations as true." *Carver v. Atwood*, 18 F.4th 494, 496 (5th Cir. 2021). "For a 12(b)(1) motion, the general burden is on the party asserting jurisdiction." *Dickson v. United States*, 11 F.4th 308, 312 (5th Cir. 2021). "A district court may dismiss a case under Rule 12(b)(1) based on '(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.'" *In re S. Recycling, L.C.C.*, 982 F.3d 374, 379 (5th Cir. 2020) (quoting *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996)). Once the subject matter jurisdiction has been challenged, the party asserting jurisdiction retains the burden of proof that jurisdiction truly does exist. *Haverkamp v. Linthicum*, 6 F.4th 662, 668 (5th Cir. 2021).

Rule12(b)(6), in turn, provides for dismissal of an action for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its *face*.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).

A claim is said to be plausible if the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678. "[A] plaintiff's obligation to prove the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 554-55. When

considering a Rule 12(6)(b) motion to dismiss, district courts are "limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010); *see also Wright v. Dollar Tree Stores, Inc.*, No. 3:14-CV-01472, 2014 WL 11456816, at *4 (N.D. Tex. Sep. 16, 2014) (recognizing that a Rule 12(6)(b) motion generally limits a court to consideration of the well-pleaded allegations of Plaintiff's complaint, including any attachments thereto or documents incorporated by reference herein).

## IV.   DISCUSSION

### A.   Official Capacity Claims Seeking Monetary Relief under § 1983

A suit against a state officer in his or her official capacity is effectively a suit against that state official's office. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). Unless waived, the Eleventh Amendment bars claims for money damages against a state or state agency. *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996); *Aguilar v. Texas Dep't of Criminal Justice*, 160 F.3d 1052, 1054 (5th Cir. 1998). As such, an action for monetary damages against a state official in his or her official capacity is one against the state itself and is barred by the Eleventh Amendment. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985). The Fifth Circuit has extended the Eleventh Amendment immunity specifically to TDCJ officers and officials acting in their official capacities. *See Oliver v. Scott*, 276 F.3d 736, 742 (5th Cir. 2002) (concluding that the Eleventh Amendment bars a

prisoner's § 1983 lawsuit for money damages against prison officials in their official capacities).

Defendants contend in their Motion to Dismiss that, to the extent Plaintiff sues them in their official capacities for money damages, those claims are barred by the Eleventh Amendment. (D.E. 28, p. 3). Plaintiff responds that his claims for money damages are not barred because they rest on the VRA. (D.E. 31, p. 1). However, Plaintiff brought his First Amendment claims under § 1983 with his VRA claims arising under a separate statute. Accordingly, with respect to Plaintiff's First Amendment claims arising under § 1983, the undersigned recommends that Defendants' Motion to Dismiss (D.E. 28) be granted and that Plaintiff's claims for money damages against Defendants and the Unknown DRC members[4] in their official capacities be dismissed without prejudice.[5]

---

[4] The Unknown DRC members have not yet been served or entered an appearance in this case. Nevertheless, the recommended dismissal should apply to them for the same reasons it applies to Defendants. "The Fifth Circuit has recognized that, when one defending party establishes that the plaintiff has no cause of action, this defense generally inures also to the benefit of other similarly situated defendants." *Taylor v. Collier*, No. H-21-2161, 2022 WL 2871819, at *4 n.2 (S.D. Tex. July 21, 2022) (Rosenthal, C.J.) (citing *Lewis v. Lynn*, 236 F.3d 766, 768 (5th Cir. 2001)); *see also Russell v. King*, No. 6:20-CV-00430-JDK, 2021 WL 3205053, at *5 (E.D. Tex. Jun. 23, 2021), *adopted*, 2021 WL 3190617 (E.D. Tex. Jul. 27, 2021) (concluding that a known defendant's successful defense barring official capacity claims for money damages under the Eleventh Amendment also inures to the benefit of a similarly situated unknown defendant). "The policy rationale for this rule is that it would be incongruous and unfair to allow some defendants to prevail, while not providing the same benefit to similarly situated defendants." *Lewis*, 236 F.3d at 768 (internal quotation marks omitted).

[5] Claims implicating the Eleventh Amendment are dismissed without prejudice because the Eleventh Amendment deprives the Court of subject matter jurisdiction. *See Planned Parenthood Gulf Coast, Inc. v. Phillips*, 24 F.4th 442, 450 (5th Cir. 2022) (observing that "the Eleventh Amendment generally deprives federal courts of jurisdiction" over certain suits); *United States v. Texas Tech Univ.*, 171 F.3d 279, 285 n.9 (5th Cir. 1999) ("While the Supreme Court has left this question open, [the Fifth Circuit] has repeatedly referred to the Eleventh Amendment's restriction in terms of subject matter jurisdiction.").

### B.     Claims Seeking Injunctive Relief

Plaintiff seeks injunctive relief in the form of allowing him to vote in the future for as long as he is eligible through changes in the TDCJ voting policies.  (D.E. 14, pp. 21-23). Defendants contend that Plaintiff's requested injunctive relief is subject to dismissal as moot.  (D.E. 28, pp. 3-4).

A court lacks subject matter jurisdiction when a case becomes moot.  *See Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 78-79 (2013).  The mootness doctrine "applies to equitable relief."  *Brinsdon v. McAllen Indep. Sch. Dist.*, 863 F.3d 338, 345 (5th Cir. 2017).  The mootness doctrine is applicable in this case as Plaintiff seeks injunctive relief as part of his overall prayer for relief.  *See Kovac v. Wray*, 449 F. Supp. 3d 649, 653 (N.D. Tex. Mar. 27, 2020).

Mootness is a threshold issue that is essential to the constitutional case-or-controversy requirement and therefore to this court's subject-matter jurisdiction.  *See Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co.*, 704 F.3d 413, 424-25 (5th Cir. 2013); *Rocky v. King*, 900 F.2d 864, 866 (5th Cir. 1990).  The mootness doctrine "requires that the controversy posed by the plaintiff's complaint be 'live' not only at the time the plaintiff files the complaint but also throughout the litigation process."  *King*, 900 F.2d at 866. When intervening circumstances "render the court no longer capable of providing meaningful relief to the plaintiff," mootness applies.  *Ctr. for Biological Diversity*, 704 F.3d at 425.  The Fifth Circuit recognizes that declaratory and injunctive relief is not available to remedy a past harm.

Requests for injunctive and declaratory relief implicate the intersection of the redressability and injury-in-fact requirements. The redressability requirement limits the relief that a plaintiff may seek to that which is likely to remedy the plaintiff's alleged injuries. Because injunctive and declaratory relief "cannot conceivably remedy any past wrong," plaintiffs seeking injunctive and declaratory relief can satisfy the redressability requirement only by demonstrating a continuing injury or threatened future injury. That continuing or threatened future injury, like all injuries supporting Article III standing, must be an injury in fact.

*Stringer v. Whitley*, 942 F.3d 715, 720-21 (5th Cir. 2019) (footnotes omitted). Courts, therefore, lack "constitutional jurisdiction" to resolve an issue where there is no Article III controversy. *See Goldin v. Bartholow*, 166 F.3d 710, 717 (5th Cir. 1999).

Defendants contend that Plaintiff's Burnet County felony convictions, to which he was sentenced on May 17, 2022, recently became final and that, under Texas law, Plaintiff has now been stripped of his right to vote. *Id.* at 4. Defendants contend, therefore, "there is no live controversy warranting the imposition of an injunction." *Id.* Plaintiff responds that his convictions are not final because: (1) he has filed a motion for *en banc* reconsideration of his PDR which is pending; and (2) even if his motion for reconsideration was denied, his convictions would not be considered final until the Supreme Court either denies a writ of certiorari or issues an adverse ruling on the merits against Plaintiff. (D.E. 31, pp. 4-5).

Certain inmates serving sentences in Texas prisons may be entitled to vote. The Texas Constitution lists the classes of persons not allowed to vote. This list includes "persons convicted of any felony, subject to such exceptions as the Legislature may make." TEX. CONST., Art. 6, Sec. 1 (a)(3). The Texas Election Code lists the requirements for a

person to be a "qualified voter." TEX. ELEC. CODE § 11.002. Included among the

requirements are that the person:

> (4) has not been *finally convicted* of a felony or, if so convicted, has
>
> > (A) fully discharged the person's sentence, including any term of incarceration, parole, or supervision, or completed a period of probation ordered by any court; or
> >
> > (B) been pardoned or otherwise released from the resulting disability to vote[.]

TEX. ELEC. CODE § 11.002(a)(4) (emphasis added).

The Texas Election Code does not define the words "finally convicted" but under

Texas law, a conviction is not final while an appeal is pending. "When a defendant gives

notice of appeal in the trial court when he or she was convicted of the prior offense, that

action prevents the conviction from becoming final until the appeal has been decided. It is

a conviction, but not a final conviction so long as the appeal is pending." 2 Tex. Prac.

Guide: Crim. Prac. & Proc. § 25:141 (2023); *See also March v. State*, 5 Tex. App. 450, 456

(1879) ("[I]n a criminal prosecution, when the accused has taken an appeal in the manner

prescribed by law, the proceeding is still pending and undetermined until the appeal shall

have been decided[.]").

In Texas, "the law is settled that a conviction from which an appeal has been taken

is not considered to be a final conviction until the conviction is affirmed by the appellate

court and that court's mandate of affirmance becomes final." *Fletcher v. State*, 214 S.W.3d

5, 6 (Tex. Crim. App. 2007) (quoting *Jones v. State*, 711 S.W.2d 634, 636 (Tex. Crim. App.

1986); *see also Carter v. State*, 510 S.W.2d 323, 324 (Tex. Crim. App. 1974) ("It is, of course, axiomatic that if an appeal has been taken from a judgment of guilty in the trial court, that conviction does not become final until the trial court judgment has been affirmed by the appellate court . . . . "); *Norman v. U.S. Attorney General for the Western Dist. of Texas*, No. 23-50360, 2024 WL 64769, at *2 (5th Cir. Jan. 5, 2024) ("The district court correctly dismissed Norman's claims of interference with his right to vote against TDCJ personnel . . . because, as a convicted felon, Norman is ineligible to vote.  Contrary to his assertions on appeal that his conviction is not yet final, Norman's murder conviction was affirmed on direct appeal.").

In this case, Plaintiff has now been finally convicted of a felony as there is no appeal pending from his 2022 Burnett County felony convictions.  On June 29, 2024, the Third District Court of Appeals affirmed Plaintiff's Burnet County convictions and sentences. *Diez v. State*, 693 S.W.3d 899 (Tex.App.—Austin 2024, pet. ref'd).  The Texas Court of Criminal Appeals then refused Plaintiff's PDR on March 12, 2025.  *Id.*  Records from the Third District Court of Appeals reflect that: (1) the TCCA denied his motion for rehearing *en banc* on April 23, 2025; and (2) the Third District Court of Appeals issued its mandate on May 13, 2025.[6]

It is not readily apparent whether the Texas Election Code contemplates the filing and/or pendency of a petition for writ of certiorari from a PDR when determining whether

---

[6] *See* https://search.txcourts.gov/Case.aspx?cn=03-22-00337-CR&coa=coa03.

an individual is finally convicted of a felony.[7]  Even assuming this period of time constitutes a pending appeal as it relates to the finality of a conviction, Supreme Court rules provided Plaintiff ninety days after the TCCA refused his PDR to file a petition for writ of certiorari in the Supreme Court.  *See* Sup. Ct. R. 13.1.  In a response dated June 4, 2025, Plaintiff indicates that he potentially would be filing a petition for writ of certiorari in the Supreme Court within 90 days of the TCCA's refusal of his PDR.  (D.E. 40, p. 2).  However, nowhere in his numerous responses does Plaintiff indicate that he actually filed a petition for writ of certiorari from the date his PDR was refused.  The undersigned has found no court records showing Plaintiff has filed his petition for writ of certiorari within 90 days of either the date his PDR was refused (March 12, 2025), the date his motion for rehearing *en banc* was denied (April 23, 2025), or the date the mandate was issued (May 13, 2025).

In the absence of any pending appeal from his 2022 felony Burnet County convictions, the undersigned finds that Plaintiff is "finally convicted" and, therefore, not eligible to be a "qualified voter" in Texas.  *See* TEX. CONST., Art. 6, Sec. 1 (a)(3); TEX. ELEC. CODE § 11.002.  Because he no longer has the right to vote until his Burnet County sentence is entirely discharged, there is no live controversy warranting the imposition of an injunction in this case.  Accordingly, the undersigned recommends that Defendants'

---

[7] In the context of determining whether a federal habeas petition is timely filed, the Antiterrorism and Effective Death Penalty Act ("AEDPA") establishes a one-year statute of limitations which often runs from the date on which the [state criminal] judgment become final by the conclusion of direct review or the expiration of the time for seeking such review."  *See* 28 U.S.C. § 2244(d)(1).  It is well settled that a conviction becomes final in the habeas context when the 90-day period for filing a petition for writ of certiorari expires on appeals where a PDR was refused.  *See* Sup. Ct. R. 13.1;  *id.*44(d)(1)(A); *Roberts v. Cockrell*, 319 F.3d 690, 693 (5th Cir. 2003); *Bradshaw v. Davis*, 736 F. App'x 457, 459-61 (5th Cir. 2018).

Motion to Dismiss (D.E. 28) be granted on this issue and that Plaintiff's claims seeking injunctive relief against them and the Unknown DRC members[8] be dismissed without prejudice[9] for lack of subject matter jurisdiction on mootness grounds.[10]

### C.    Damages under the VRA

"The [VRA] was signed into law on August 6, 1965, by President Lyndon Johnson. It outlawed the discriminatory voting practices adopted in many southern states after the Civil War, including literacy tests as a prerequisite to voting." *Milestone Documents, Voting Rights Act* (1965), Nat'l Archives.[11]  The VRA provides many measures to protect the right to vote.  Courts have played an important role in ensuring compliance with the Act.  While Plaintiff cites various sections of the VRA, the sections under which Plaintiff is seeking to raise claims is not stated with precision.  Plaintiff cites generally to the protections of "the Federal Voting Rights Act, 52 U.S.C.S. Sec. 10101 et seq."  (D.E. 2, p. 1).  He also cites Section 20102(b)(B)(ii) as authority for state officials having an affirmative duty to assist the elderly to vote.  Nevertheless, Section 10307(a) of the VRA provides in part:

> (a)    Failure or refusal to permit casting or tabulation of vote. No person
> acting under color of law shall fail or refuse to permit any person to

---

[8] The recommended dismissal should apply to the unknown DRC members for the same reasons it applies to Defendants.  *See Lewis*, 236 F.3d at 768; *Taylor*, 2022 WL 2871819, at *4 n.2.

[9] *See Mitchell v. Bailey*, 982 F.3d 937, 944 (5th Cir. 2020) (holding that claims dismissed for lack of subject matter jurisdiction are dismissed without prejudice).

[10] Because the undersigned recommends that Plaintiff's claims for injunctive relief are subject to dismissal as moot, it is unnecessary to consider Defendants' alternative arguments that his requested injunctive relief is unavailable under either *Ex parte Young*, 209 U.S. 123 (1908) or the Prison Litigation Reform Act.  (*See* D.E. 28, pp. 4-5).

[11] www.archives.gov/milestone-documents/voting-rights-act.

vote who is entitled to vote under any provision of chapters 103 to 107 of this title or is otherwise qualified to vote, or willfully fail or refuse to tabulate, count, and report such person's vote.

(b)    Intimidation, threats, or coercion. No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote, or intimidate, threaten, or coerce any person for exercising any powers or duties under section 10302(a), 10305, 10306, or 10308(e) of this title or section 1973d or 1973g of Title 42.

In *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 690 (2021) Justice Gorsuch noted in his concurring opinion that the Supreme Court has assumed—without deciding—that an implied right of action exists under the VRA.  *See also Coal. for Good Governance v. Kemp*, No. 1:21-CV-02070-JPB, 2021 WL 12299010, at *14 (N.D. Ga. Dec. 9, 2021). In *Robinson v. Ardoin*, 86 F.4th 574 (5th Cir. 2023), the Fifth Circuit noted that with the VRA, Congress abrogated sovereign immunity and must have done so with a purpose.  *Id.* at 588.  "The purpose surely is to allow the States to be sued by someone." *Id.*  The Court held that the VRA created a private right of action under Section 10301 of the Act.  *Id.*

Defendants contend in their Motion to Dismiss that money damages are unavailable under the VRA because the only available  remedy is equitable relief.  (D.E. 28, pp. 5-6). Plaintiff initially responds that the Defendants' reliance on Ninth Circuit precedent to support their position is not binding on this Court.  (D.E. 31, p. 6).

In support of their argument, Defendants cite to the Ninth Circuit's decision in *Olagues v. Russoniello*, 770 F.2d 791 (9th Cir. 1985).  The Ninth Circuit held:

> The [VRA] does not specify any statutory damage remedies. No case has been cited nor have we found one in which damages were recovered. In determining whether to construe an implied cause of action, the principal focus must be on congressional intent. . . . The legislative history nowhere suggests any action for damages. . . . That history points out that "[t]he sole consequence" of the provision for a private cause of action under the [VRA] "is to broaden the scope of equitable relief which may be requested" to include the "special remedies" specified in the [VRA]. . . .
>
> Moreover, Supreme Court precedent suggests that private plaintiffs are limited to damage actions under 42 U.S.C. § 1983. . . . Equitable relief suffices to fulfill the purpose of the [VRA], which is to ensure the right to register and vote at the polls. . . . We decline to imply any action for damages.

*Id.* at 805 (internal citations omitted). Several district courts echo the conclusion reached in the Ninth Circuit's *Olagues* decision. *See Rhodes v. Siver*, No. 19-12550, 2021 WL 912393, at *2 (E.D. Tex. Mar. 10, 2021) (following the decisions of multiple courts which hold that the VRA does not have a statutory damages remedy); *Krieger v. Loudon Cnty.*, No. 5:13cv073, 2014 WL 4923904, at *5 (W.D. Va. Sep. 30, 2014) (concluding that the VRA did not provide "a private cause of action for damages"); *Foreman v. Dallas Cnty., Tex.*, 990 F. Supp. 505, 514 (N.D. Tex. 1998) ("The [VRA] does not specify any statutory damages remedies, and a right to damages should not be implied."); *Windy Boy v. Big Horn Cnty.*, 647 F. Supp. 1002, 1023 (D. Mont. 1986) ("Injunctive relief is the universal remedy when plaintiffs prevail in [VRA] cases.").

In two additional responses, Plaintiff contends that he may seek damages under the Fourteenth Amendment (*see* D.E. 31, p. 6; D.E. 37, p. 1). In another response, Plaintiff

cites 52 U.S.C. § 20510(d)(1)[12] of the VRA as well as Justice Harlan's concurrence in *Monroe v. Pape*, 365 U.S. 167 (1961) as support for his argument that he may seek monetary damages under the VRA because it does not abrogate any claims he might have under the common law.  (D.E. 39, p. 1).  Justice Harlan points out in *Pape* that "[t]here will be many cases in which the relief provided by the state to the victim of a use of state power which the state either did not or could not constitutionally authorize will be far less than what Congress may have thought would be fair reimbursement for deprivation of a constitutional right."  *Pape*, 365 U.S. at 196 n.5 (Harlan, J., concurring).

Plaintiff's argument that the VRA authorizes statutory damages is not entirely clear. Neither the *Pape* decision nor § 20510(d)(1) answers or otherwise addresses the specific question whether statutory damages are available as a private remedy for a VRA claim. Plaintiff does not cite, and the undersigned has not found, any authority holding Plaintiff is entitled to monetary relief under the VRA.  The undersigned concludes consistent with persuasive authority that, while equitable relief fulfills the purpose of the VRA, a private individual like plaintiff is limited to damage actions under § 1983 in seeking to protect his right to vote.  Accordingly, even accepting Plaintiff's allegations as true, the undersigned recommends that Defendants' Motion to Dismiss (D.E. 28) be granted on this issue and

---

[12] "The rights and remedies established by this section are in addition to all other rights and remedies provided by law, and neither the rights and remedies established by this section nor any other provision of this chapter shall supersede, restrict, or limit the application of the Voting Rights Act of 1965."  52 U.S.C. § 20510(d)(1).

that Plaintiff's claims for money damages under the VRA against Defendants and the unknown DRC members[13] be dismissed with prejudice.

### D.    Section 1983 Claims Seeking Compensatory Damages

"No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury . . . ." 42 U.S.C. § 1997e(e).   This section "applies to all federal civil action in which a prisoner alleges a constitutional violation," including claims seeking actual or compensatory damages for violations of the First Amendment absent a physical injury. *Geiger v. Jowers*, 404 F.3d 371, 375 (5th Cir. 2005).

Defendants contend that Plaintiff is barred under the PLRA from obtaining compensatory damages because he does not allege any physical injury. (D.E. 28, p. 10). Plaintiff responds that § 1997e(e) does not apply because he does not expressly seek mental or emotional damages and instead seeks redress for the deprivation of his right to vote. (D.E. 31, pp. 9-10).

Here, while Plaintiff does not expressly seek damages for mental or emotional injury, he also alleges nothing to show he has suffered a physical or economic injury from not being allowed to vote in the 2024 election.   Because he alleges no physical injury, he is barred from seeking compensatory, actual damages in this case.[14]   Accordingly, even

---

[13] The recommended dismissal should apply to the unknown DRC members for the same reasons it applies to Defendants.  *See Lewis*, 236 F.3d at 768; *Taylor*, 2022 WL 2871819, at *4 n.2.

[14] The undersigned notes "that in the absence of proof of actual, compensatory damages, a plaintiff who has been deprived of his constitutional rights may … collect nominal damages."  *Lewis v. Chatterson*, No. 1:10-CV-00291, 2015 WL 9674792, at *5 (W.D. La. Oct. 7, 2015), *adopted*, 2016 WL 99115 (W.D. La. Jan. 7, 2016).  In addition, "a

accepting Plaintiff's allegations as true, the undersigned recommends that Defendants' Motion to Dismiss (D.E. 28) be granted on this issue and that Plaintiff's claims for compensatory damages for his § 1983 claims against Defendants and the unknown DRC members[15] be dismissed with prejudice.

### E.    First Amendment Claims Against Defendants in their Individual Capacities

Defendants contend that they are entitled to qualified immunity with respect to Plaintiff's First Amendment claims retained against them in their respective individual capacities.  (D.E. 28, pp. 6-10).  The defense of qualified immunity protects government officials from personal liability for monetary damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Qualified immunity, which is designed to give public servants "breathing room to make reasonable but mistaken judgments," protects "all but the plainly incompetent or those who knowingly violate the law."  *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (internal quotations omitted).  Qualified immunity shields public officials from claims for monetary damages unless a plaintiff shows "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time

---

punitive award may stand in the absence of actual damages where there has been a constitutional violation.  *Id.* (citing *Louisiana Acorn Fair Housing v. LeBlanc,* 211 F.3d 298, 303 (5th Cir. 2000)).

[15] The recommended dismissal should apply to the unknown DRC members for the same reasons it applies to Defendants.  *See Lewis*, 236 F.3d at 768; *Taylor*, 2022 WL 2871819, at *4 n.2.

of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow*, 457 U.S. at 818).

> The Fifth Circuit recently explained:
>
> When confronted with a qualified-immunity defense at the pleadings stage, the plaintiff must plead "facts which, if proved, would defeat [the] claim of immunity." *Waller v. Hanlon*, 922 F.3d 590, 599 (5th Cir. 2019) (quoting *Westfall v. Luna*, 903 F.3d 534, 542 (5th Cir. 2018)). The pleading standards remain "the same when a motion to dismiss is based on qualified immunity. The crucial question is whether the complaint pleads facts that, if true, would permit the inference that Defendants are liable under § 1983[,] and would overcome their qualified immunity defense." *Terwilliger v. Reyna*, 4 F.4th 270, 279-80 (5th Cir. 2021) (internal quotations and citations omitted). At the motion to dismiss stage, "[i]t is the plaintiff's burden to demonstrate that qualified immunity is inappropriate." *Id.* at 280 (citing *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009)).

*Guerro v. Castillo*, 82 F.4th 278, 285 (5th Cir. 2023). A government official's conduct violates clearly established law when, at the time of the challenged conduct, "the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft*, 563 U.S. at 741 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (cleaned up)). A binding court case directly on point is not required, but "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*; *see also Malley v. Briggs*, 475 U.S. 335, 341 (1986).

"Abstract or general statements of legal principle untethered to analogous or near-analogous facts are not sufficient to establish a right 'clearly' in a given context; rather the inquiry must focus on whether a right is clearly established as to the specific facts of the case." *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015) (citing *Brosseau v.*

24 / 40

*Haugen*, 543 U.S. 194, 198 (2004)).  Absent controlling authority, there must be a "robust 'consensus of cases of persuasive authority.'"  *Ashcroft*, 563 U.S. at 741 (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)).  The controlling decision or consensus must be with regard to the official's "particular conduct," described with specificity.  *Harmon v. City of Arlington, Tex.*, 16 F.4th 1159, 1166 (5th Cir. 2021) (citing *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (emphasis in original)).  The second step of the qualified immunity inquiry is judged against the backdrop of the law at the time of the conduct.  *Morgan v. Chapman*, 629 F. Supp.3d 616, 630 (S.D. Tex. 2022) (Tipton, J.) (citing *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam)).

Courts have discretion to decide the order in which to consider the two-prong inquiry when determining whether qualified immunity is warranted.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."); *Cleveland v. Bell*, 938 F.3d 672, 676 (5th Cir. 2019) ("If the plaintiff fails at either step, the federal court can grant qualified immunity by addressing either step or both of them.").

### 1.    Right to Vote

To state a § 1983 claim, a plaintiff must allege a violation of the Constitution or of federal law and then allege that the violation was committed by an individual acting under the color of state law.  *See Turner v. Lieutenant Driver*, 848 F.3d 678, 685 (5th Cir. 2017).

Claims premised on violations of state law, however, are not actionable under § 1983. *See Castelan v. Villarreal*, No. 5:23-CV-1394-JKP-RBF, 2025 WL 424538, at *16 (W.D. Tex. Feb. 6, 2025); *Couvillion v. Lopinto*, No. 24-590, 2024 WL 2739321, at *3 (E.D. La. May 2, 2024), *adopted*, 2024 WL 2722298 (E.D. La. May 28, 2024); *see also Woodard v. Andrus*, 419 F.3d 348, 353 (5th Cir. 2005) ("However, a violation of a state statute alone is not cognizable under § 1983 because § 1983 is only a remedy for violations of federal statutory and constitutional rights.").

The Supreme Court has recognized that the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections. *Reynolds v. Sims*, 377 U.S. 533, 554 (1964). "Voting rights are fundamental, and alleged disfranchisement of even a small group of potential voters is not to be taken lightly." *O'Brien v. Skinner*, 409 U.S. 1240, 1242 (1972). The individual's right to vote is firmly implied in the First Amendment of the United States Constitution and is protected as a fundamental right by both the Due Process and Equal Protection Clauses of the Fourteenth Amendment. *Veasey v. Perry*, 71 F. Supp.3d 627, 684-85 (S.D. Tex. 2014), *aff'd in part, vacated in part, remanded sub nom. Veasey v. Abbott*, 796 F.3d 487 (5th Cir. 2015), *on reh. en banc*, 830 F.3d 216 (5th Cir. 2016) and *aff'd in part, vacated in part, rev'd in part sub nom. Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (citations omitted).

According to Defendants, Plaintiff's eligibility to vote in the 2024 election was a state statutory benefit conferred by the Texas Election Code because he had previously been convicted of a felony conviction in 1982 to which he received a 30-year sentence.

(D.E. 28, p. 7). Defendants contend that, as a re-enfranchised felon, Plaintiff retained only a state statutory right to vote and not a First Amendment right to vote actionable under § 1983. *Id.* at 6-7. Thus, Defendants argue, "any actions taken by Defendants to impede Plaintiff's ability to vote in 2024 amounted to nothing more than interference with a state statutory benefit, not a constitutional right." *Id.* at 7.

Plaintiff responds that the "reenfranchisement clause" in the Texas Election Code restored his right to vote that had been previously taken away by due process and, therefore, cannot be taken away without due process because it is a fundamental constitutional right. (D.E. 31, p. 7). Plaintiff argues further that Texas's re-enfranchisement of felons who discharge their sentences restores the felons' constitutional right to vote because the relevant Texas Election Code provision "applies equally to citizens who have no criminal record" and "ergo, the former disenfranchised [felon] is entitled to continue to vote . . . the same as any other citizen who has never been convicted." *Id.* Lastly, Plaintiff argues that "the Texas Congress chose not to avail themselves of" the ability to permanently disenfranchise felons and must live with that choice. *Id.* at 8.

"Under Section Two of the Fourteenth Amendment, the right to vote can be limited by state law." *Voice of the Experienced v. Ardoin*, No. 23-331-JWD-SDJ, 2024 WL 2142991, at *34 (M.D. La. May 13, 2024). The Supreme Court explains:

> The States have long been held to have broad powers to determine the conditions under which the right of suffrage may be exercised, absent of course the discrimination which the Constitution condemns. Article I, s 2 of the Constitution in its provision for the election of members of the House of Representatives and the Seventeenth Amendment in its provision for the election of Senators provide that officials will be chosen "by the People."

Each provision goes on to state that "the [e]lectors in each State shall [have] the [q]ualifications requisite for [e]lectors of the most numerous [b]ranch of the State [l]egislature[s]."

So while the right of suffrage is established and guaranteed by the Constitution[,] it is subject to the imposition of state standards which are not discriminatory and which do not contravene any restriction that Congress acting pursuant to its constitutional powers, has imposed. While s 2 of the Fourteenth Amendment, which provides for apportionment of Representatives among the States according to their respective numbers counting the whole number of persons in each State (except Indians not taxed), speaks of "the right to vote," the right protected "refers to the right to vote as established by the laws and constitution of the state."

We do not suggest that any standards which a State desires to adopt may be required of voters. But there is wide scope for exercise of its jurisdiction. Residence requirements, age, previous criminal record are obvious examples indicating factors which a State may take into consideration in determining the qualifications of voters.

*Lassiter v. Northampton City Board of Elections*, 360 U.S. 45, 51 (1959) (internal citations omitted).

The Supreme Court subsequently has held that, under Section Two of the Fourteenth Amendment, states can disenfranchise those with felony convictions. *See Richardson v. Ramirez*, 418 U.S. 24, 54 (1974) ("[T]he exclusion of felons from the vote has an affirmative sanction in s 2 of the Fourteenth Amendment ...."); *see also Hunter v. Underwood*, 471 U.S. 222, 233 (1985). Such felony disenfranchisement arises not only from the language of Section Two of the Fourteenth Amendment but also through the intent of the framers. *Ardoin*, 2024 WL 2142991, at * 34 (citing *Richardson*, 418 U.S. at 54). In

*Richardson*, the Supreme Court specifically held that California law,[16] which allowed the state to disenfranchise imprisoned felons the right to vote, did not violate the Fourteenth Amendment's equal protection rights. *Richardson*, 418 U.S. at 53-56.

Two circuit courts have addressed whether a re-enfranchised individual—a person convicted of a felony who has served his sentence—retains a constitutional right to vote. First, in *Wilkins v. Cnty. of Alameda*, 571 F. App'x 621 (9th Cir. 2014), the Ninth Circuit considered whether Alameda County and county officials violated Keenan Wilkins's fundamental right to vote. *Id.* at 623. Wilkins was convicted of a felony in 1999, but was subsequently deemed to be a re-enfranchised voter under California law because he had completed his sentence and any parole. *Id.* (citing Cal. Const. art. II, § 4; Cal. Elec .Code § 2101). The Ninth Circuit, however, recognized it had "previously held that such re-enfranchisement is a statutory benefit conferred by the state. *Id.* (citing *Harvey v. Brewer*, 605 F.3d 1067, 1079 (9th Cir. 2010). Accordingly, the Ninth Circuit held that "Wilkins's claim concerns the alleged deprivation of a state statutory right, which is not actionable in a suit under § 1983." *Id.*

Next, in *Valenti v. Lawson*, 889 F.3d 427 (7th Cir. 2018), the Seventh Circuit considered the claims of Brian Valenti, a convicted felon and registered sex offender, asserting that the state of Indiana had violated "his right to vote by refusing to let him enter a polling site at a school." *Id.* at 428. The Seventh Circuit initially determined that Valenti

---

[16] *See* Cal. Const. Art. II, § 4; Cal. Elec. Code § 2101 ("A person entitled to register to vote shall be a United States citizen, a resident of California, not imprisoned for the conviction of a felony, and at least 18 years of age at the time of the next election.").

did not retain a right to vote under the First and Fourteenth Amendments because "Section 2 of the Fourteenth Amendment gives states the 'affirmative sanction' to exclude felons from the franchise.'" *Id.* at 429 (quoting *Richardson*, 418 U.S. at 54). The circuit court noted that Indiana had affirmatively chosen to disenfranchise convicted felons who are imprisoned following conviction. *Id.* at 429-30 (citing Ind. Code § 3-7-13-4(a); Ind. Const. art. II, § 8). The Seventh Circuit further noted that Indiana law allowed for the re-enfranchisement of felons to vote once they are no longer imprisoned. *Id.* at 430 (citing Ind. Code § 3-7-13-5).[17] Nevertheless, the Seventh Circuit held that Valenti retained at most a statutory right to vote in Indiana, and not a constitutional right. *Id.*

In this case, Plaintiff does not contest the fact he was previously convicted of a felony in 1982. The TDCJ's website reflects that Plaintiff was convicted of burglary of a habitation and was sentenced on July 21, 1982, to thirty years in prison.[18] Plaintiff, therefore, was disenfranchised from voting due to this felony conviction, and was not re-enfranchised under Texas law until he fully discharged his thirty-year sentence imposed in 1982. *See* TEX. ELEC. CODE § 11.002(a)(4).

The Fifth Circuit has not addressed the precise issue presented here regarding whether Plaintiff retained, at most, only a statutory right to vote in Texas in connection with the 2024 election. The undersigned finds that the re-enfanchisement clause under

---

[17] Under Indiana law, the statutory re-enfranchisement right is not without restrictions: "for example, serious sex offenders cannot enter school grounds to vote and must use an alternative method instead, such as an absentee ballot." *Valenti*, 889 F.3d at 430 (citing Ind. Code § 35-42-4-14(b); Ind. Code § 3-11-10-24(a)(12)).

[18] *See* TDCJ inmate search at: https://inmate.tdcj.texas.gov/InmateSearch/viewDetail.action?sid=01968225 (last visited on September 17, 2025).

Texas election law is similar in material respects to election laws effective in both California and Indiana which conferred a statutory voting right to felons once they were no longer in prison and had served their sentences. Contrary to Plaintiff's argument, the relevant language in § 11.002(a)(4)(A) applies only to convicted felons and sets forth a statutory right to vote once the convicted felon has "fully discharged [his or her] sentence, including any term of incarceration, parole, or supervision, or completed a period of probation ordered by any court."[19] Section 11.002 only contains statutory requirements for voting in Texas and does not reference any underlying constitutional right.

In following the reasoning set forth in *Alameda* and *Valenti*, the undersigned finds that Plaintiff retained only a statutory right to vote upon being re-enfranchised to vote under Texas Election Code 11.002(a)(4)(A). As such, even accepted as true, Plaintiff's allegations fail to state a plausible First Amendment claim pertaining to his right to vote in the 2024 election. Because Plaintiff has failed to state a First Amendment right-to-vote claim against Defendants in their individual capacities, it is unnecessary to examine whether their actions were objectively unreasonable under clearly established law. *See Pearson*, 555 U.S. at 236. Because Defendants are entitled to qualified immunity, the undersigned recommends that Defendants' Motion to Dismiss (D.E. 28) be granted on this

---

[19] *See Shepherd v. Trevino*, 575 F.2d 1110, 1114 (5th Cir. 1978) ("Section 2's express approval of the disenfranchisement of felons thus grants to the states a realm of discretion in the disenfranchisement and reenfranchisement of felons which the states do not possess with respect to limiting the franchise of other citizens").

issue and that Plaintiff's First Amendment right-to-vote claims be dismissed with prejudice against Defendants and the Unknown DRC members.[20]

### 2.    Right to Receive Mail

The First Amendment provides that Congress shall make no law . . . abridging the freedom of speech. U.S. Const., amend I.  A prisoner retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological interests of the correction system.  *Pell v. Procunier*, 417 U.S. 817, 822 (1974).  An abridgement of the rights of free speech occurs when the government engages in unjustified interference with communications.  *See Brewer v. Wilkinson*, 3 F.3d 816, 820 (5th Cir. 1993).

Inmates retain a First Amendment right to be free from mail censorship not "reasonably related to legitimate penological interests."  *Schwarzer v. Wainwright*, No. 19-14011, 2021 WL 6060002, at *1 (5th Cir. Dec. 17, 2021) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)); *see Thornburgh v. Abbott*, 490 U.S. 401, 409 (1989).  Thus, "prisoners and their correspondents enjoy the protections of the First Amendment except to the extent that prison regulations curtailing those protections are 'reasonably related to legitimate penological interests.'" *Prison Legal News v. Livingston*, 683 F.3d 201, 204 (5th Cir. 2012) (quoting *Thornburgh*, 490 U.S. at 404).

---

[20] The rule that the successful invocation of defenses inures to the benefit of other similarly situated defendants also applies "to dismiss claims based on qualified immunity, even where the defendant has not appeared in the case." *Schwarzer v. Wainwright*, No. 6:18-CV-00034, 2023 WL 2950639, at *25 (S.D. Tex. Jan. 17, 2023) (collecting cases) (Neurock, M.J.), *adopted*, 2023 WL 2645538 (S.D. Tex. Mar. 17, 2023) (Tipton, J.).  The recommended dismissal on qualified immunity grounds, therefore, should apply to the Unknown DRC members for the same reasons it applies to Defendants. *See Lewis*, 236 F.3d at 768; *Schwarzer*, 2023 WL 2950639, at *25.

The plaintiff bears the burden to show that the challenged policy or regulation, as applied, is not reasonably related to a legitimate penological interest. *Overton v. Bazzeta*, 539 U.S. 126, 132 (2003). In evaluating the reasonableness of a prison regulation, four factors are considered: (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it," (2) "whether there are alternative means of exercising the right that remain open to prison inmates," (3) "the impact accommodation . . . will have on guards and other inmates, and on the allocation of prison resources generally," and (4) whether there are ready alternatives that could "fully accommodate[ ] the prisoner's rights at de minimis cost to valid penological interests." *Turner*, 482 U.S. at 89-91 (internal citations and quotation marks omitted). While *Turner's* standard encompasses four factors, the Fifth Circuit has noted that "rationality is the controlling factor, and a court need not weigh each factor equally." *Mayfield v. Tex. Dept. of Crim. Just.*, 529 F.3d 599, 607 (5th Cir. 2008) (citation omitted).

Defendants contend that BP-03.91, which governs inmate correspondence, "is in place for the legitimate penological purpose of limiting the flow of contraband into TDCJ's facilities." (D.E. 28, p. 8). According to Defendants, Mailroom Supervisor Schneider confiscated Plaintiff's ballots "because they violated BP-03.91's rule limiting what may be included with forms requiring an inmate's signature." *Id.* Because this rule serves a legitimate penological policy, Defendants contend that Plaintiff cannot state a First Amendment claim with respect to his right to receive mail. *Id.*

Plaintiff responds that BP-03.91 "cannot possibly be construed to apply to official ballots sent to an inmate from the Elections Administrator in the inmate's official voting district." (D.E. 31, p. 8). Plaintiff further disputes whether a legitimate penological interest existed to justify denying his mail containing the absentee voter form. *Id.* at 9.

BP-03.91 provides that most non-legal correspondence must be sent to a centralized digital mail processing center to be scanned and electronically distributed to inmates. (BP-03.91, p. 6). One exception exists for documents requiring an inmate's signature, which may be sent directly to the inmate's unit. *Id.* at 7. The correspondence policy sets forth that the "envelope should only include the form and any instructions on how to complete the form or where to send the completed form." *Id.* In his *Spears* hearing testimony, Plaintiff stated that there was a policy, presumably BP-03.91, that prevented him from getting forms in general. (D.E. 14, pp. 11-12). Plaintiff further indicated, however, that he was not under the impression that such a policy applied to absentee ballot forms. *Id.* at 12. BP-03.91 further references that contraband found in incoming letters will be removed from the letter and that the letter would not be delivered to the inmate if the contraband cannot be removed. (*See* BP-03.91, p. 11).

Defendants cite two cases to demonstrate that the correspondence rules at issue in BP-03.91 are rationally related to legitimate penological interests. First, in *Wilson v. Texas Dep't of Crim. Just.*, No. 7:05-CV-011-R, 2005 WL 1018041 (N.D. Tex. Apr. 28, 2005), the district court considered inmate Wilson's claims that his First Amendment rights "were violated when he was informed that his letter to Congressman Pete Sessions did not qualify

for sealed correspondence." *Id.* at 1.  The court dismissed Plaintiff's complaint as frivolous on the pleadings, concluding that "the exercise of control over the mail for purposes of security [related to contraband] is a legitimate penological objective." *Id.* at 1-2.  The second case cited by Plaintiff is *Lopez v. Lumpkin*, No. 4:20-CV-3307, 2022 WL 18399530, at *2 (S.D. Tex. Nov. 22, 2022) (Bryan, M.J.), *reconsideration denied*, 2023 WL 348338 (S.D. Tex. Jan. 20, 2023) (Bryan, M.J.) (granting summary judgment on inmate's First Amendment claim, concluding that BP-03.91's limitation on the quantity of photographs an inmate can receive was rationally related to the legitimate penological interest in stopping the influx of drugs and contraband).

The cases cited by Defendants are useful in understanding the purpose and application of the TDCJ policies, however, they are not particularly useful or dispositive in resolving the issues before the Court.  In the initial screening M&R in this case, which was adopted by District Judge Ramos (D.E. 10, D.E. 41), the Court found Plaintiff had stated a First Amendment claim against Schneider, Lumpkin, and the DRC, in connection with his right to receive a legitimate election ballot by mail.  Defendants have presented no reason for the Court to reconsider this decision.  The undersigned did not consider or address qualified immunity in the screening M&R.  However, qualified immunity is now squarely before the Court in Defendants' Motion to Dismiss and must be addressed.  (D.E. 28, pp. 8-10).

Regarding qualified immunity, and whether Defendants violated a federal statutory or constitutional right of Plaintiff, Defendants have articulated no persuasive arguments to

suggest Plaintiff's allegations are insufficient to state First Amendment claims against either Schneider or Lumpkin concerning his right to receive mail in the form of a voting ballot. Plaintiff's allegations reflect that: (1) he was unable to cast his vote in the November 2024 election due to Mailroom Supervisor Schneider's refusal to give Plaintiff his voting ballot on two occasions (D.E. 1, pp. 6-7; D.E. 14, pp. 7-9); and (2) he was not under the impression any written policy would interfere with his ability to obtain an absentee voting form (D.E. 14, p. 12). Furthermore, according to Plaintiff, Mailroom Supervisor Schneider denied Plaintiff the ballots on two occasions only by informing Plaintiff that he was a prisoner and was not going to vote. (D.E. 14, pp. 8-9). Plaintiff indicates that Mailroom Supervisor Schneider did not reference any rules contained in BP-03.91.

Plaintiff's allegations further reflect that Director Lumpkin was involved in instituting a policy or practice of preventing inmates like Plaintiff who were eligible to vote from voting. (D.E 14, pp. 17, 20-23). Plaintiff alleges that, as a TDCJ prisoner, he was allowed to vote at one time but that the policies have changed to allow for interference with an inmate's ability to vote. *Id.* at 22-23. Accordingly, accepting his allegations as true, Plaintiff has stated plausible First Amendment claims against Defendants concerning his right to receive mail in the form of voting ballots. For purposes of qualified immunity, the undersigned finds Defendants violated Plaintiff's First Amendment right to receive mail in connection with the confiscation of Plaintiff's absentee ballot.

The undersigned, therefore, will consider the second prong of the qualified immunity analysis. Under the second prong of the qualified immunity analysis, the Court

36 / 40

must determine whether Defendants' actions were objectively unreasonable under clearly established law.  Defendants contend it was "not 'beyond debate' that BP-03.91's limit on the methods by which forms may be sent to inmates violates the First Amendment."  (D.E. 28, p. 9).  They further contend that "the law was clearly established that preventing the flow of contraband is a legitimate penological interest, and that prison officials are afforded deference in determining the best methods of achieving that objective."  *Id.*  Plaintiff responds that he informed all the defendants in this case about the applicable laws and consequences if not allowed his ballot so that he could vote.  (D.E. 31, p. 9).

In the context of considering qualified immunity, it is appropriate to consider exactly what happened in this case.  Plaintiff was a prisoner in TDCJ custody who was serving a sentence for a felony offense.  He applied for, and was sent by prison mail, a ballot to vote in an election.  The defendants refused to allow Plaintiff to receive this item of mail.  As explained above, because Plaintiff was at that time a qualified voter, Defendants violated Plaintiff's First Amendment right to receive mail when they interfered with his receipt of his legitimate election ballot.  However, the undersigned is unable to find a case that is analogous to the instant case.  General statements of legal principles not tethered "to analogous or near-analogous facts are not sufficient to establish a right clearly in a given context."  *See Vincent*, 805 F.3d at 547 (internal quotations and citation omitted).

The undersigned is not prepared to find the defendants were on "fair warning" or "fair notice" that they were violating Plaintiff's rights.  The fact that a portion of the TDCJ inmate community may retain the right to vote during the direct appeal of their criminal

case is, quite frankly, somewhat surprising.  While the undersigned is concerned that TDCJ officials have not done enough to secure the right to vote for this class of inmates, the state of the law is not so clear as to prevent Defendants from receiving the protection of qualified immunity.  This rationale applies equally to the Unknown DRC members.  Therefore, for purposes of qualified immunity the undersigned recommends the Court find the law was not clearly established and Defendants—as well as the Unknown DRC members—were not given reasonable warning that the conduct then at issue violated constitutional rights. *Ramirez v. Martinez*, 716 F.3d 369, 379 (5th Cir. 2013).

Accordingly, the undersigned recommends that Defendants' Motion to Dismiss (D.E. 28) be granted as to Plaintiff's First Amendment right-to-receive mail claims brought against them in their individual capacities as they are entitled to qualified immunity and that the Court also dismiss these claims as to the Unknown DRC members.[21]

## V.    RECOMMENDATION

For the foregoing reasons, the undersigned respectfully recommends that Defendants' Motion to Dismiss (D.E. 28) be **GRANTED.**  Specifically, Defendants' Motion to Dismiss (D.E. 28) should be **GRANTED** as follows:

- **DISMISS without prejudice** Plaintiff's claims for money damages under § 1983 against Defendants and the unnamed members of the DRC in their official capacities;

- **DISMISS without prejudice** Plaintiff's claims seeking injunctive relief against Defendants and the unknown DRC members for lack of subject matter jurisdiction on mootness grounds;

---

[21] The recommended dismissal on qualified immunity grounds should apply to the Unknown DRC members for the same reasons it applies to Defendants. *See Lewis*, 236 F.3d at 768; *Schwarzer*, 2023 WL 2950639, at *25.

- **DISMISS with prejudice** Plaintiff's claims for money damages under the VRA against Defendants and the Unknown DRC members;

- **DISMISS with prejudice** Plaintiff's claims for compensatory damages for his § 1983 First Amendment claims against Defendants and the Unknown DRC members;

- **DISMISS with prejudice** Plaintiff's First Amendment right-to-vote claims against Defendants and the Unknown DRC members in their individual capacities as they are entitled to qualified immunity; and

- **DISMISS with prejudice** Plaintiff's First Amendment right-to-receive mail claims against Defendants and the unnamed DRC members in their individual capacities as they are entitled to qualified immunity.

If the Court adopts all of the undersigned's recommendations in this M&R, Plaintiff will have no further claims before the Court. Therefore, the undersigned recommends the Court **DISMISS** this action in its entirety and enter final judgment against Plaintiff.

Respectfully submitted on September 24, 2025.

Jason B. Libby
United States Magistrate Judge

## <u>NOTICE TO PARTIES</u>

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **FOURTEEN (14) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  *Douglass v. United Servs. Auto Ass'n,* 79 F.3d 1415 (5th Cir. 1996) (en banc).